**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**NATIONAL LIFE INSURANCE COMPANY,**

                    **Plaintiff,**

  **vs.**                                                  **1:15-cv-00439**
                                                         **(MAD/CFH)**

**ROBERT M. GOMEZ; and FIRST COMMUNITY**
**BANK OF ARKANSAS, as Legal Guardian of the**
**Estates of TTO and CRO, Minors,**

                    **Defendants.**
_____

**ROBERT M. GOMEZ**

                    **Counter Claimant,**

  **vs.**

**NATIONAL LIFE INSURANCE COMPANY**

                    **Counter Defendant.**
_____

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| **MCNAMEE, LOCHNER LAW FIRM**<br>677 Broadway<br>Albany, New York 12207-2503<br>Attorneys for Plaintiff/Counter Defendant | **G. KIMBALL WILLIAMS, ESQ.** |
| **OFFICE OF KENNETH V. GOMEZ**<br>600 Third Avenue, Suite 1500<br>New York, New York 10016<br>Attorney for Defendant/Counter Claimant | **KENNETH V. GOMEZ, ESQ.** |
| **AKERMAN LLP - NEW YORK OFFICE**<br>666 Fifth Avenue, 20th Floor<br>New York, New York 10103<br>Attorneys for Defendant First Community<br>Bank of Arkansas | **NATHAN T. HORST, ESQ.** |
| **AKERMAN, SENTERFITT LAW FIRM**<br>Wilton Office<br>582 Nod Hill Road<br>Wilton, Connecticut 06897<br>Attorneys for Defendant First Community | **DONALD N. DAVID, ESQ.** |

Bank of Arkansas

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff National Life Insurance Company ("National Life") commenced this interpleader action on April 13, 2015, seeking to resolve competing claims to the proceeds of a life insurance policy in the name of Jane H. Gomez ("Decedent"). *See* Dkt. No. 1. Currently before the Court is National Life's motion to deposit funds, and Defendant First Community Bank of Arkansas' ("First Community") cross motion for summary judgment and motion to strike Defendant Robert M. Gomez' ("Defendant Gomez") opposition to said cross motion. *See* Dkt. Nos. 26, 30, 40. On May 2, 2015, the Court heard oral arguments on these motions.

### II. BACKGROUND

On December 13, 2007, Decedent applied for a life insurance policy with National Life. Dkt. No. 39-3 at ¶ 1. On that date, Decedent and her husband, Defendant Gomez, met with insurance agent Kiran Bora ("Bora") to complete an application for a life insurance policy (the "application"). *Id.* at ¶¶ 2, 3. Decedent listed Defendant Gomez as the primary beneficiary when she first filled out the application, which she signed when Defendant Gomez was still listed as the primary beneficiary. *Id.* at ¶ 10. At some point thereafter, Bora crossed out Defendant Gomez's name as primary beneficiary and added TTO and CRO, Decedent's two grandsons (the "grandsons"), each as 50% beneficiaries. *See* Dkt. No. 47-5 at 49. Bora initialed the application where he wrote in the grandsons as beneficiaries, but Decedent did not sign the application after the change was made. *Id.* The parties dispute whether the substitution of beneficiaries in the application was done at Decedent's request. Dkt. No. 39-3 at ¶ 13.

National Life stamped the application as accepted on December 18, 2007 at 11:35 a.m. *See* Dkt. No. 47-5 at 49. When National Life received the application, Decedent's grandsons were designated as equal beneficiaries, with Defendant Gomez's name crossed off as primary beneficiary. Dkt. No. 26-1 at ¶ 5. The application contained errors in the spelling of the grandsons' names and their physical addresses. Dkt. No. 39-3 at ¶ 24. On December 18, 2007 at 4:02 p.m., after the application had been submitted to National Life, Defendant Gomez sent insurance agent Gary Scofield ("Scofield") an e-mail containing the correct names and addresses of the grandsons. *See* Dkt. No. 47-7 at 2. This e-mail was faxed to National Life on December 21, 2007. *See* Dkt. No. 47-8 at 2. The application was never amended to correct the spelling of the grandsons names or addresses. 47-5 at 49.

On or about March 5, 2008, National Life issued the policy to Decedent in the amount of $358,977.00 (the "policy"). Dkt. No. 26-1 at ¶ 3. Since the application was initially for a $500,000 policy, National Life sent Decedent a request to amend the application to reflect the reduced policy amount. *Id.* at ¶¶ 6, 7. On March 25, 2008, Decedent signed forms from National Life titled "Receipt of Policy" and "Request to Amend New Issue Application." *See* Dkt. No. 47-9 at 2, 4. While the Receipt of Policy form does not have any of the boxes checked to indicate what Decedent actually received, Defendant Gomez's attorney declared that Decedent received the policy, including the application, on March 28, 2008.[1] Dkt. No. 39-1 at ¶ 7. The Request to Amend New Issue Application form did not mention the beneficiaries and only indicated that the policy was issued for the amount of $358,997, instead of the initial $500,000. *Id.* at 4. The policy issued to Decedent stated that the beneficiary was "[a]s stated in the application unless

---

[1] The Court notes that there is a discrepancy between the date Decedent signed the receipt of policy form, which was March 25, 2008, and the date stamped as received by National Life and attested to by Defendant Gomez's attorney, which is March 28, 2008.

3

later changed." Dkt. No. 47-5 at 2. The application that was attached to the policy stated that the grandsons were both equal beneficiaries, with Defendant Gomez's name crossed out as a beneficiary. *Id.* at 49. The policy was paid to date and in full force when Decedent died in September of 2013. Dkt. No. 39-3 at ¶¶ 49, 50. Neither Decedent or Defendant Gomez made any request to change the policy between March of 2008 and September of 2013. *Id.* at ¶ 51. On November 5, 2014, First Community was appointed guardian of the estates for the grandsons. Dkt. No. 26-1 at ¶ 11.

### III. DISCUSSION

**A.     Motion to Deposit Funds**

National Life's motion to deposit funds seeks four separate grounds for relief: (1) directing National Life to deposit the total amount of decedent's life insurance policy, plus interest, into the Court's registry; (2) discharging National Life from any liability pertaining to those funds deposited with the Court; (3) granting a permanent injunction prohibiting any future action against National Life arising out of the facts surrounding this case; and (4) awarding National Life reasonable attorney's fees and costs. *See* Dkt. No. 26-9. The first two sections of National Life's motion are unopposed. *See* Dkt. No. 31 at 9.

A district court may discharge a stakeholder under 28 U.S.C. § 2361 if the action involves "a fund greater than $500; adverse claimants of diverse citizenship; a deposit of the fund in court; and a disinterested stakeholder." *Mendez v. Teachers Ins. & Annuity Ass'n & Coll. Ret. Equities Fund*, 982 F.2d 783, 787 (2d Cir. 1992). National Life has fulfilled each of these requirements in this action. Accordingly, National Life is ordered to deposit **$358,877.00**, with interest at the rate of 3% from September 22, 2013 through the date of deposit, into the Court's registry. National Life is discharged from any future liability pertaining to the deposited funds.

### *1. Permanent Injunction*

28 U.S.C. § 2361 "authorizes a district court to discharge the stakeholder in any civil interpleader action from further liability to claimants." *Mendez*, 982 F.2d at 787. However, a stakeholder should not be discharged from an action if it "may be independently liable to a claimant." *N.Y. Life Ins. Co. v. Apostolidis*, 841 F. Supp. 2d 711, 720 (E.D.N.Y. 2012) (citing *N.Y. Life Ins. Co. v. Conn. Dev. Auth.*, 700 F.2d 91, 95 (2d Cir. 1983)) (other citation omitted). In cases where a stakeholder may be liable for claims other than to the stake of the interpleader action, "the court may discharge the plaintiff from liability on the stake but retain jurisdiction over the plaintiff" for the remaining claims. *William Penn Life Ins. Co. of N.Y. v. Viscuso*, 569 F. Supp. 2d 355, 361 (S.D.N.Y. 2008) (citations omitted).

National Life argues that a permanent injunction barring any future claims arising out of the circumstances of this case is appropriate because it has satisfied all of the requirements under the interpleader statute and no claims of independent liability have been asserted against it. *See* Dkt. No. 43 at 4-6. The Court concludes that the statements contained in Defendant Gomez's counterclaims alleging impropriety in the process of issuing the instant insurance policy raise the possibility that some claim of independent liability may exist. *See* Dkt. No. 19 at ¶¶ 47-110. While no claims of independent liability have yet been asserted against National Life, it would be premature to grant a permanent injunction prohibiting any such claims from being brought in the future. Accordingly, National Life's motion for a permanent injunction against all future claims of liability is denied.

### *2. Attorney's Fees*

5

"Attorneys' fees and costs may be awarded to an innocent stakeholder who successfully initiates a suit as an interpleader under Rule 22." *Feehan v. Feehan*, No. 09 Civ. 7016, 2011 WL 497852, *6 (S.D.N.Y. Jan. 10, 2011) (citation omitted); *see also Travelers Indem. Co. v. Israel*, 354 F.2d 488, 490 (2d Cir. 1965) (noting that the decision to award fees and costs is left "to the sound discretion of the district court"). Courts in the Second Circuit have consistently held that "[a]n award of attorneys' fees to an insurer is appropriate only when the expense incurred for the interpleader action exceeded the *ordinary* cost of doing business." *Feehan*, 2011 WL 497852, at *7 (quotation and citations omitted).

To the extent than an insured is entitled to receive an award of fees, the request may be adjusted to recover costs only for the tasks that go beyond those that would be incurred in the ordinary course of business. *See Weininger v. Castro*, 462 F. Supp. 2d 457, 502 (S.D.N.Y. 2006); *see also State Farm Life Assur. Co. v. Epps*, No. 12-CV-380S, 2013 WL 3992754, *6-7 (W.D.N.Y. July 22, 2013) (awarding $2,000 for costs incurred outside interpleader's ordinary course of business, despite accruing a total of $15,000 in attorney's fees for the entire action). The percentage of fee award in comparison to the total death benefit is a factor in determining any appropriate award. *See Hartford Life Ins. Co. v. Pottorff*, No. 5:13-CV-77, 2014 WL 1393751, *7 n.4 (N.D.N.Y. Apr. 9, 2014).

National Life contends that the instant interpleader action required work in excess of an ordinary dispute between multiple claimants to a policy. *See* Dkt. No. 43 at 9. The extra expenses arose because, *inter alia*, National Life sought to pay the benefits to the grandsons, but were faced with a competing claim from Defendant Gomez. *Id.* The grandsons were not appointed a guardian ad litem for nearly a year after Decedent's death. When a guardian was finally appointed, it did not accept service for the instant action, which required National Life to

obtain an extension of time to serve and hire a process server. *Id.* The guardian of the grandsons was thereafter changed. *Id.* In all, National Life has been engaged in protracted litigation for two and a half years since Decedent's death. The Court finds that the complicated nature of this case, coupled with the Defendants' lack of diligence in complying with National Life's requests, brings the instant action outside of the scope of the ordinary course of insurance business. *See, e.g.*, *Epps*, 2013 WL 3992754, at *6-7 (awarding fees when insurance company had to investigate the proper parties to serve on behalf of minor beneficiaries and locate the correctional facility where the defendant was residing); *Travelers Ins. Co. v. Estate of Garcia*, No. 00-CV-2130, 2003 WL 1193535, *4-5 (E.D.N.Y. Feb. 4, 2003) (awarding fees to insurance company that was threatened with three separate claims, one in which the proceeds were subject to an ongoing state action, one from the identified beneficiary, and one from an estate without an administrator). Accordingly, National Life's motion for attorney's fees is granted and it is ordered to submit a detailed accounting of the fees that it incurred in bringing the instant interpleader action **within 10 days** from the filing of this Memorandum-Decision and Order.

**B.     Summary Judgment**

*1. Standard of Review*

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). It is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v.*

7

*Catrett*, 477 U.S. 317, 324 (1986) (quoting FED. R. CIV. P. 56(c), (e)).  Moreover, "disputes over irrelevant facts must not be allowed to obscure the lack of a material dispute[,]" *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 923 (2d Cir. 1985), and the court cannot consider clearly inadmissible evidence upon a motion for summary judgment, *see Maier-Schule GMC, Inc. v. Gen. Motors Corp.*, 154 F.R.D. 47, 59 (W.D.N.Y. 1994) (citation omitted).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted).  However, "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted).  Where the non-movant fails to sufficiently dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions.  *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

### *2. Undisputed Facts*

Defendant Gomez's response to First Community's statement of material facts denies a majority of the assertions stated therein.  *See* Dkt. No. 39-3.  However, Defendant Gomez's responses and his memorandum of law rely heavily on rhetorical questions and unfounded speculation, which are insufficient to dispute properly supported facts as stated by First Community.  Significantly, neither party has provided any sworn statements from Defendant

Gomez or agent Bora to clarify what transpired at the December 13, 2007 and March 25, 2008 meetings between Decedent, Bora, and Defendant Gomez. The Court notes that Bora's November 18, 2013 unsworn statement is highly inconsistent with the documents in the record and was created well after the dates of the meeting in question, and, as such, will not be relied upon in ruling on the instant motion. *See* Dkt. No. 47-6; *see also Maier-Schule GMC, Inc.*, 154 F.R.D. at 59. Drawing all reasonable inferences in Defendant Gomez's favor, the record supports the following factual findings.

- Decedent and Defendant Gomez met with Bora on December 13, 2007 to fill out a life insurance application on Decedent's behalf. Dkt. No. 39-3 at ¶¶ 1-3.

- At this meeting, Decedent signed the insurance application that listed Defendant Gomez as the sole beneficiary. *Id.* at ¶ 5.

- Bora crossed out Defendant Gomez as sole beneficiary and placed the grandsons, with incorrectly spelled names and addresses, each as 50% beneficiaries. Dkt. No. 47-5 at 49.

- Bora made this change outside of Decedent's presence, without her written permission, and before receiving the e-mail from Defendant Gomez that contained the grandsons correctly spelled names and addresses. *See id.*; Dkt. No. 47-7.

- National Life received the application that contained the grandsons listed as 50% beneficiaries with Defendant Gomez's name crossed off as primary beneficiary. Dkt. No. 26-1 at ¶ 5.

- Decedent received the application on or about March 25, 2008 and signed a "Receipt of Policy" and a "Request to Amend New Issue Application" form, which changed the policy coverage from $500,000 to $358,977. Dkt. No. 47-9; Dkt. No. 39-1 at ¶ 7.

- Decedent paid the premiums on the policy from its issuance until her death in 2013. Dkt. No. 39-3 at ¶¶ 49, 50.

- Neither Decedent nor Defendant Gomez attempted to change the beneficiaries as stated in the policy from the date it was issued until Decedent's death. *Id.* at ¶ 51.

### *3. Beneficiary Designation*

First Community argues that summary judgment must be granted in its favor because the only application ever considered by National Life, and the only policy ever issued to Decedent, contained the grandsons named as beneficiaries. *See* Dkt. No. 30-10 at 7. Defendant Gomez argues that he is the correct beneficiary under the policy because the grandsons were never properly designated by Decedent as beneficiaries. *See* Dkt. No. 39 at 7-9.

New York courts have consistently held that an insurance policy that has been accepted and signed for by the insured, including the attached application, represents the final and binding terms of that policy. *See SR Int'l Bus. Ins. Co. Ltd. v. World Trade Ctr. Props. LLC*, No. 01 Civ. 9291, 2003 WL 554768, \*3 (S.D.N.Y. Feb. 26, 2003) ("Under New York law, 'once an insurance policy is received the owner is generally bound by the terms of the policy expressed in the actual policy. Said policy replaces any previous binder or oral representations made in negotiating the policy'" (quotation omitted)). This general rule likewise applies when an insurance agent completes an application without the insured's written consent to do so; the application as submitted by the insurance agent is deemed controlling if the insured accepted and acknowledged the policy containing the altered application, so long as there is no showing of fraud on behalf of the agent. *See, e.g.*, *Brauman v. Prudential Ins. Co. of Am.*, 157 N.Y.S.2d 631, 632 (Sup. Ct. Dutchess Cnty. 1956) ("The insured had a duty to read the application which was attached to the policy and to correct any misstatements contained therein. This duty survives the completion of

10

the application by the agent and the failure of the insured to read it before he signs it" (citing *Stanulevich v. St. Laurence Life Ass'n*, 228 N.Y. 586 (1920)) (other citation omitted)); *Del Monte v. Travelers Ins. Co.*, 17 N.Y.S.2d 555, 556 (1st Dep't 1940) ("Plaintiff accepted the policy as issued by the defendant and thereby ratified the change which the company made in the application for the policy. Plaintiff may not now claim that he did not know the contents of the policy and the application").

In the frequently-cited case of *Metzger v. Aetna Ins. Co.*, the New York Court of Appeals explained the consequences of accepting a written insurance contract.

> It has often been held that when a party to a written contract accepts it as a contract he is bound by the stipulations and conditions expressed in it whether he reads them or not. Ignorance through negligence or inexcusable trustfulness will not relieve a party from his contract obligations. He who signs or accepts a written contract, *in the absence of fraud or other wrongful act* on the part of another contracting party, is conclusively presumed to know its contents and to assent to them, and there can be no evidence for the jury as to his understanding of its terms. This rule is as applicable to insurance contracts as to contracts of any other kind.

*Metzger v. Aetna Ins. Co.*, 227 N.Y. 411, 416 (1920) (emphasis added) (citations omitted); *see also Caporino v. Travelers Ins. Co.*, 62 N.Y.2d 234, 239 (1984) ("[Courts] may not disregard clear provisions which the insurers inserted in the policies and the insured accepted"). However, the presumption that an insured who receives a policy has read and accepted its terms "does not automatically apply where wrongful conduct has been alleged against the insurer." *Cunningham v. Ins. Co. of N. Am.*, 521 F. Supp. 2d 166, 175 (E.D.N.Y. 2006) (citing *Metzger*, 227 N.Y. at 416). This exception to the presumption has been extended to include the wrongful acts of an insurance broker who "creates a misimpression, whether wilful or not, with regard to an insured's policy . . . ." *Id.* at 176 (citation omitted). A finding of fraud in the execution of a contract "arises where a party did not know the nature or the contents of the document being signed, or the

11

consequences of signing it, and was nonetheless misled into doing so." *Whitehead v. Town House Equities, Ltd.*, 780 N.Y.S.2d 15, 17 (2d Dep't 2004) (citations omitted).

Defendant Gomez relies on 11 NYCRR § 52.51(f) to support his argument that Decedent's acceptance of the policy cannot be deemed a ratification of the changes that Bora made to the application. That section states "[n]o application shall contain an agreement that acceptance of any policy issued upon the application will constitute a ratification of any changes or amendments made by the insurer and inserted in the application, except in conformity with section 3204(d) of the Insurance Law." 11 NYCRR § 52.51(f). Defendant Gomez's reliance on this regulation is misplaced as it only applies to "accident and health insurance," and does not regulate applications for the life insurance policy at issue in this case. *See* 11 NYCRR §§ 52.51(f), 52.90(a), 52.2(a); N.Y. Insurance Law § 1113(3). Thus, this regulation does not negate the longstanding presumption in New York that an insured who receives and accepts a life insurance policy, including the attached application, approves of the statements made on the application.

Relying heavily on *Androvette v. Treadwell*, 73 N.Y.2d 746 (1988), Defendant Gomez contends that the grandsons are not the proper beneficiaries of the policy because Bora's unilateral act of adding their names to the application was in violation of N.Y. E.P.T.L. § 13-3.2(e) and Insurance Law § 3204(d). E.P.T.L. § 13-3.2(e) states that "[a] designation of a beneficiary or payee to receive payment upon death of the person making the designation or another must be made in writing and signed by the person making the designation . . . ." Insurance Law § 3204(d) states that "[n]o insertion in or other alteration of any written application for any [life insurance] policy or contract shall be made by any person other than the applicant without his written consent, except that insertions may be made by the insurer for administrative purposes only in such manner as to indicate clearly that the insertions are not to be ascribed to the applicant." In

12

*Androvette*, the insured took out a group insurance policy and signed a group enrolment and record card, which designated his wife as beneficiary. 73 N.Y.2d at 747. The insured later requested the insurance policyholder to change the beneficiary, which the agent did by whiting out the insured's wife's name and replacing it with the new beneficiary. *Id.* The insured never signed the record card after the change of beneficiary was completed. *Id.* The Court of Appeals held that, despite the insured's clear intention to change beneficiaries, the actions of the policyholder's agent were ineffective in light of the requirement in E.P.T.L. § 13-3.2(d) that the change "must be made in writing and signed by the person making the designation." *Id.* Specifically, the Court of Appeals concluded that "Decedent's signature, rendered when he originally designated plaintiff as beneficiary, cannot validate his later attempt to change the beneficiary." *Id.*

The instant case is distinguishable from *Androvette* in that Decedent signed and acknowledged her insurance policy after the application had been completed to designate the grandsons as beneficiaries. Unlike *Androvette*, where the insured did not sign the policy after the beneficiary had been changed, and the signature on the policy from before the change was effected could not be said to "validate his later attempt to change the beneficiary," Decedent signed for receipt of the instant life insurance policy on March 25, 2008, and it is undisputed that the application listed the grandsons as the beneficiaries at the time of this signature. Further, the designation of the grandsons on the instant policy was the initial designation of beneficiaries on the policy at it was first issued, rather than an attempt to change an existing beneficiary on an in-force policy as in *Androvette*. Thus, following the longstanding presumption applied by New York courts, absent fraud or misrepresentation, Decedent is presumed to have read, acknowledged, and accepted the terms as stated in the policy, including the beneficiary

13

designation as stated in the application. If this presumption applies, then Decedent's signature accepting the policy and attached application are sufficient to constitute a signature designating the grandsons as beneficiaries consistent with E.P.T.L. § 13-3.2(d) and Insurance Law § 3204(d).

In light of the lack of evidence concerning what transpired at the December 13, 2007 and March 28, 2008 meetings between Decedent, Defendant Gomez, and agent Bora, the Court finds that there is a question of material fact as to whether Bora's actions amounted to fraud or misrepresentation. If fraud or misrepresentation exists, the presumption that Decedent read and accepted the terms of the application would not apply. There is no credible, let alone undisputed, evidence to indicate that Bora changed the beneficiary designation as directed by Decedent. Bora's unsworn statement is contradictory with numerous other exhibits and replete with errors, thus, it cannot be relied upon to remove any question of fact as to the propriety of Bora's actions. Drawing all inferences in Defendant Gomez's favor, the Court could find that Decedent requested to have the grandsons listed as contingent beneficiaries and maintain Defendant Gomez as the primary beneficiary, rather than remove him as a beneficiary completely. If this were the case, Bora's crossing out Defendant Gomez and adding the grandsons as primary beneficiaries would be a material misstatement on the application. This misstatement, even if unintentional, could be sufficient to rebut the presumption of accepting the terms of the application if Bora subsequently assured Decedent that the application contained all the terms that they had agreed on, and that she did not need to review it when she received it on March 25, 2008. Without any credible evidence from either Defendant Gomez or agent Bora concerning what was communicated between the parties at the December 13, 2007 and March 28, 2008 meetings, the record contains unresolved questions of material fact. Accordingly, summary judgment is not appropriate at this time.

**C.      Motion to Strike**

On April 12, 2016, First Community moved to strike Defendant Gomez's opposition to its cross motion for summary judgment due to his repeated disregard for Court imposed deadlines. *See* Dkt. No. 40. The Court set the initial deadline to respond to First Community's motion for March 28, 2016. *See* Dkt. No. 35. On March 30, two days after the deadline had passed, Defendant Gomez's Attorney, Kenneth Gomez ("Attorney Gomez") asked the Court for an extension of time to file his opposition. Attorney Gomez specifically requested to have until 5:00 p.m. on April 1, 2016 to file his submission. *Id.* The Court advised Defendant Gomez that requests for extension generally must be made before deadlines have passed, but still granted his late request and ordered that "no further extensions will be granted." *Id.*; Dkt. No. 36.

On April 1, 2016, Attorney Gomez called the Court to request an extension to file his opposition until midnight of that day. The Court granted an additional extension until 5:00 p.m. on April 4, 2016. On April 4, sometime after 5:00 p.m., Attorney Gomez again called the Court and asked for an extension until midnight of that day. The Court advised that he may submit his response before midnight, yet nothing was filed that day. On April 6, 2016, counsel for National Life called the Court to inquire about any response to the pending motion. The Court advised that it had not heard any further communications from Attorney Gomez and did not expect a response to be filed. Later that day, Attorney Gomez again called the Court with an excuse for why he had not filed his response and, at the instruction of the Court, submitted a letter request for another extension of time to respond. Dkt. No. 37. The Court granted this request, setting the response deadline for Friday, April 8, 2016 at 5:00 p.m., and once again ordered that "NO FURTHER EXTENSIONS WILL BE GRANTED." Dkt. No. 38. Friday, April 8 came and went, yet Attorney Gomez failed to file any response to First Community's motion. On Monday, April 11,

15

2016, Attorney Gomez finally filed his opposition. Dkt. No. 39. While the declaration attached to this opposition stated that it included 16 exhibits, only two were attached to the docket entry. Dkt. No. 39-1.

In its motion to strike, First Community states that it received an e-mail from Attorney Gomez on April 8, 2016 explaining that he had trouble submitting his opposition with the electronic filing system. *See* Dkt. No. 40-3. This e-mail contains a copy of Defendant Gomez's memorandum of law, declaration, and response to First Community's statement of facts. *Id.* The drafts of the memorandum of law and statement of facts that Attorney Gomez filed with the Court on April 11 are substantially altered from those that he sent to First Community on April 8. *See* Dkt. Nos. 40-9, 40-10. On April 13, 2016, the Court directed First Community to respond to the version of Defendant Gomez's opposition that was filed with the Court on April 11. Shockingly, this was not the end of Attorney Gomez's untimely filings. On April 29, 2016, three days before oral arguments were scheduled on the pending motions, Attorney Gomez filed an additional response in opposition to First Community's motion that attached the sixteen exhibits initially described in his April 8 declaration. *See* Dkt. No. 47.

At oral arguments on May 2, 2016, the Court addressed Defendant Gomez's utter disregard for Court orders and his numerous untimely responses in opposition to First Community's cross motion for summary judgment. Accordingly, First Community's motion to strike that response is denied as moot. However, the Court reinforces its instructions from the oral argument that all future orders of the Court are to be strictly enforced, and if any party requires clarification of, or requests to alter a Court order, they are instructed to file such request with the Court's electronic filing system and not to call the Court *ex parte* seeking relief.

**IV. CONCLUSION**

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above stated reasons, the Court hereby

**ORDERS** that National Life's motion to deposit the insurance policy funds (Dkt. No. 26) is **GRANTED in part** and **DENIED in part**, as stated herein; and the Court further

**ORDERS** that National Life submit a detailed accounting of its costs and attorneys fees incurred in this action **within 10 days** from the filing of this Memorandum-Decision and Order; and the Court further

**ORDERS** that National Life deposit **$358,877.00**, with interest at the rate of 3% from September 22, 2013 through the date of deposit, into the Court's registry; and the Court further

**ORDERS** that National Life is **DISMISSED** from this case and discharged from any further liability as to the deposited funds; and the Court further

**ORDERS** that First Community Bank's cross motion for summary judgment (Dkt. No. 30) is **DENIED**; and the Court further

**ORDERS** that First Community Bank's motion to strike (Dkt. No. 40) is **DENIED** as moot; and the Court further

**ORDERS** that any further discovery in this action is to be completed **within 60 days** from the filing of this Memorandum-Decision and Order and any dispositive motions are due **30 days thereafter**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: May 12, 2016
       Albany, New York

Mae A. D'Agostino
U.S. District Judge